S. AUGUSTA FREEMAN, administratrix, &c., of Charles D. Freeman, and WILSON FITZGERALD

*v.*

THE SEA VIEW HOTEL COMPANY, THE SEA VIEW LAND COMPANY et al.

[Decided April 30th, 1898.   Filed January 4th, 1899.]

1. A bill charged fraud in the directors of a hotel company (1) in conveying its land to a land company, claiming that directors of the hotel company were interested in the purchase by the land company, and (2) in a purchase by the hotel company of land in which some of its directors were interested. The proof showed that after the property had been bargained to be sold by the hotel company, a stockholder in the hotel company joined in the formation of the land company; that a director in the hotel company, and one of the committee to sell, was a partner of a party who induced certain persons to form the land company; that only one of the directors of the hotel company had any interest in the land sold to the company, and he did not know that the purchase was being made for the hotel company.—*Held*, insufficient to sustain the allegation.

2. A hotel company, a corporation, has power to sell and convey its real estate by virtue of *P. L. of 1896 p. 277*, providing that every corporation may hold, purchase and convey such real estate as the purposes of the corporation shall require, not exceeding the amount limited by its charter, although such power of sale is not clearly expressed in its charter.

3. The directors of a hotel corporation were charged with negligence in making a sale of its property, and were sought to be made liable therefor. The evidence showed that the directors sold the property for the best obtainable price, in order to change the location of the hotel, which had become unprofitable. The number of shares of stock was one hundred and twenty-six, which had never sold for more than $1,000 a share. The property sold for $129,000 in cash, the furniture being reserved. A boom occurred in the city, and the purchasers, by a sale, made a large profit; but the directors had no reasonable belief that such boom would occur, as same was brought on by a combination of circumstances.—*Held*, that the directors were not liable.

4. A hotel company's charter authorized it to purchase land and maintain a hotel at or near Atlantic City, which it did. Its business became unprofitable at its location, and it sold the property and purchased at another place in the city.—*Held*, that the company could make the purchase, there being nothing in its charter restricting it.

Heard on bill, answer and proofs. ˙

[The cause was partly heard by the late Vice-Chancellor Green in his lifetime, and most of the testimony taken in his presence. After his death additional testimony was taken before a master, and the case was then brought on for final hearing on the pleadings and proofs so taken.]

*Mr. Herbert A. Drake* and *Mr. Henry B. Freeman* (of the Philadelphia bar), for the complainants.

*Mr. Peter D. Voorhees*, for the defendant the Sea View Land Company, and the defendant Fries.

*Mr. Samuel H. Grey* and *Mr. Joseph H. Gaskill*, for the Sea View Hotel Company and its individual directors, defendants.

PITNEY, V. C.

The bill was filed by Charles D. Freeman and Wilson Fitzgerald, two of the stockholders (holding eight of the one hundred and twenty-six shares of stock) of the Sea View Hotel Company. Pending the suit Mr. Freeman died, and his widow and administratrix was substituted as complainant in his place. Besides the defendant the Sea View Hotel Company, which may hereafter conveniently be called the Hotel company, certain directors thereof are made parties defendants; also a corporation known as the Sea View Land Company, which may conveniently be called the Land company, together with one Fries, a director thereof, are defendants.

The bill (filed March 2d, 1891), in the first place, attacks a conveyance of land made June 19th, 1889, by the Hotel company to the Land company, on two grounds—*first*, for want of power to convey in the mode in which the conveyance was made, and *second*, for fraud, the specification of fraud being that the property was sold at a grossly inadequate price, and that the directors (defendants herein) of the Hotel company were interested in the purchase by the Land company, and that

great profits were made by the Land company, in which the directors of the Hotel company participated; or, if there was no actual fraud, then that there was such gross negligence in the sale as to render the directors of the Hotel company liable to make good the loss. The prayer as to this branch of the bill, briefly stated, is that the defendants the Land company and the directors of the Hotel company, or some of them, may account for those profits to the Hotel company, to the end that the complainants may have their share thereof, and to that end that the Hotel company may have an account of the proceeds of so much of the lands as have been resold by the Land company to *bona fide* purchasers, and as to that portion of the lands not so sold, the same may be declared to be the property of the Hotel company.

In the second place, the bill charges that the Hotel company, about the date of the sale to the Land company, purchased other lands which it had no power to purchase, and in which certain of its directors were interested, and the prayer is that this sale may be set aside and the directors of the Hotel company be compelled to account for the actual cash invested therein, with the like view of giving the complainants their share thereof in money.

One element of the case attempted to be made by the complainants may be disposed of quite briefly. Complainants charge, with detail, the particulars of fraud in the conveyance of land by the Hotel company to the Land company and in the purchase by the Hotel company of other land from third parties, and call on the individual defendants to answer under oath. All those who lived long enough to answer have answered, and deny fully and explicitly, under oath, all the allegations of fraud. This casts upon the complainants the burden of sustaining the charge by a decided weight of evidence. This they have failed to do. Not a single one of the directors or stockholders of the Hotel company was in anywise interested in the purchase by the Land company of the lands of the former, with the possible exception of a Mr. Zimmerman, who was the secretary and treasurer of the Hotel company and also a small stockholder; and after the

Freeman *v.* Sea View Hotel Co.

property had been bargained for by two persons, to wit, the defendant Fries and a Mr. Kremer, and its purchase secured by written contract, which was May 28th, 1889, they took in Mr. Zimmerman, in order to have the benefit of his knowledge and experience of the property for the purpose of managing it, and gave him an interest in the new purchase. He joined in the formation of the corporation June 11th, and the deed was made to it June 18th. But at the argument no relief was claimed against him or his estate, he having died without answering.

The only circumstance shown in the case which tends in the slightest degree to indicate fraud in the sale of the premises is that the defendant Wood, who was a director in the Hotel company and one of the committee to sell, was a partner in business, in Philadelphia, of Mr. Kremer, who was active in inducing Mr. Fries and others to form a syndicate to purchase it. Mr. Kremer undoubtedly heard that the property was for sale from his partner, Mr. Wood, and was advised by Mr. Wood to look into it and examine its value. Mr. Fries is a gentleman of independent means, who is engaged in railroading and somewhat connected with the Pennsylvania railroad. He had no interest in the Hotel company, and I cannot see that these facts are sufficient, in view of all the other circumstances of the case, to raise even a serious suspicion that any of these defendants were directly or indirectly interested in the purchase.

With regard to the new purchase of land, none of the defendants, except Mr. John Lucas, had any interest in the lands sold to the Hotel company. The fact that the directors had decided to purchase the lands in question was properly kept a secret, and the purchase was made through agents, and those agents took an option for a small tract from Mr. Lucas without disclosing to him the fact that it was being purchased for the Hotel company, and Mr. Lucas swears that he did not know that it was so purchased. It constituted a small part of the whole tract purchased, and there is no proof or contention that it was not worth the price paid for it.

After the completion of the purchase of the new site, some

gentlemen organized a land company to purchase, on speculation, land in that neighborhood, and the defendant General Sewell, the president of the Hotel company, took an interest in it, but it does not appear that he had such venture in contemplation at the time the purchase by the Hotel company was decided upon, or that it did or could influence his action in the premises in the least degree.

So much for the allegation of fraudulent practice.

With regard to the power of the directors of the Hotel company to sell its lands, that (laying out of view the power at common law) depends, in part, upon the language of its charter, which was passed February 10th, 1869. *P. L. of 1869 p. 40.* By the first section, several gentlemen therein named, and their successors, were incorporated by the name of "The Sea View Hotel Company," and it is declared that by that name they shall

"have power to lease, purchase and hold real estate at or near Atlantic City, in the county of Atlantic, and State of New Jersey, and to erect and maintain a hotel and other buildings and improvements thereon, or upon any part thereof, for the accommodation of the public, and to mortgage said real estate with the appurtenances or any part thereof, and to transact all such business as may be incident or appertaining to the managing, erecting, furnishing, conducting, leasing, holding or mortgaging of said premises, *or otherwise controlling or disposing of the same.*"

That language seems to me to give them power to convey the land at any time that, in the judgment of the directors, it might be best for the company so to do.

But independent of the special power given by the statute, the General Corporation act (*P. L. of 1896 p. 277*), which is a reenactment of an old statute, declares that every corporation as such shall have power "to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require," not exceeding the amount limited by its charter. And this seems to be a mere declaration of the common law. *Morawetz Corp.* § *152.*

The position of the counsel of complainants is that such power to convey must be confined to a conveyance for the purpose of winding up the affairs of the corporation, in which transaction

the directors must necessarily act as trustees and not as directors, under the power given to them by the fifty-fourth section of the Corporation act of 1896 (*P. L. of 1896 p. 295*), and that it follows that they could not sell except by advertising at public sale as other trustees or public officers are required to do.

But, in my opinion, that position is untenable. First, because I do not think that the power of sale given by the statute can be confined to a power of sale for the purpose of winding up; and, in the second place, the section of the statute relied upon seems to give them, while acting as trustees, power to sell at private sale. I think the sale and conveyance were clearly within the power of the directors, as well by virtue of the statute as at common law.

But the complainants pushed their argument further, and claimed that the sale, if made with power and free from fraud, was yet so carelessly made, and the directors manifested so little judgment and exercised such a small degree of business sagacity and good management in the sale, that they are liable on the score of negligence for a very heavy loss which the complainants contend resulted.

I am by no means sure that it is necessary, for purposes of ·the present suit, to consider this position. But I have done so with care, and have examined the mass of evidence which has been given upon the question of the actual value of the property at the time it was sold and the care which was bestowed, for the purpose of obtaining a full price for the property, and have come to the conclusion that the complainants' case fails therein as well as on the other parts just referred to.

A statement of my reasons for this conclusion requires a statement of the history of the enterprise from the start.

[Statement and discussion of facts omitted.]

For these reasons I think this part of complainants' case also fails, and with it the whole case as against the Land company and Fries.

There remains, then, for consideration but a single topic, and that is the power of the directors of the Hotel company to purchase the new site and invest the moneys of the corporation

therein. The prayer in that regard is that they shall be held personally responsible to account to the Hotel company, for the benefit of its stockholders, for all the cash so invested

The argument of the counsel for complainants in support of the position that the company had no power to make the new purchase may be summarized as follows : That the company, being authorized by its charter to purchase and hold real estate and erect and maintain a hotel and other buildings and improvements thereon, was thereby limited to a single purchase and the erection and maintenance of one establishment, and having once exercised the power, its power in that behalf is expended, and it was unable to exchange those grounds and that hotel for other and different grounds and a different hotel, and that this limitation of power formed a contract between the stockholders which the majority had no right to break without the affirmative consent of each individual stockholder.

Two phases of the Hotel company's charter are to be kept in mind in considering this question. First, no particular quantity or parcel of land is mentioned in the charter, and no limitation in location except that it is to be at or near Atlantic City; and there is not a shred of evidence in the case to show that there was even an implied or verbal understanding among the stockholders, when they subscribed to the stock, that any particular site was in contemplation. This at once distinguishes it from a line of cases relied upon by the counsel where railroads are authorized, either by special charter or by their statutory organization, to build a railroad from a particular point to a particular point, which case was dealt with in *Morris and Essex Railroad Co.* v. *Central Railroad Co., 2 Vr. 205,* and the other familiar line of cases, of which *Kean* v. *Johnson, 1 Stock. 401,* is the leader in New Jersey, in which railroads have already been built and operated in accordance with the strict terms of chartered rights.

Another phase is that the only franchise which is granted by the charter is that of being a corporation. No public franchise for the condemnation of land for public purposes, or even for engaging in the public business of carrying passengers, is granted,

and no grant of eminent domain is made. Hence, the question is not, as in the case in *2 Vr.*, whether the company had the power to acquire by condemnation proceedings the new purchase.

There is, then, no question of *ultra vires* between the corporation and any individual member of the public, nor between the corporation and the state as to an abuse of its corporate power. It is a simple question between the stockholders whether or not there is anything in the original written contract between them which prevents the directors, in the exercise of their discretion and with the approval, as appears in this case, of a large majority of the stockholders, from exchanging one hotel property for another hotel property.

Now, as already remarked, there was nothing in the original charter, or in the facts accompanying the organization of the company, which can amount to a contract between the stockholders that the particular premises first purchased by it, and the particular hotel first erected thereon, was the only one which the company expected to use or own or could use or own. And we have in this case an example of the exercise by the directors of the supposed right to buy additional property, in the purchase by them of the West Jersey Excursion House, in 1886. This was done because there was really a consolidation in interest of the West Jersey railroad excursion business and that of the defendant Hotel company.

Now, the charter authorizes the company to purchase land and maintain a hotel. The circumstances showed that in the latter part of 1888 the business for which the company was organized could not be carried on to advántage upon the property then owned by it. The removal from its premises of the terminus of the railway worked a substantial destruction of its business, and it became no longer profitable for it to maintain that hotel and keep those grounds for the purposes of the corporation. It seems to me that it would be a very narrow construction to put upon the contractual aspect of the charter to say that the stockholders had agreed that, in such a posture of affairs, the company could not exchange that property for another property in a more eligible situation and where it could have the advan-

tages of a railway terminus, and thus pursue the business pro-
vided for in its charter.

I think the complainants' case fails throughout, and I will
advise a decree that the bill be dismissed, with costs.